UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| JOHN R. KETCHUM | : | DOCKET NO. 2:18-CV-00562 |
| VS. | : | JUDGE JAMES D. CAIN, JR. |
| SAINT-GOBAIN CORP. | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the Court are cross-motions for summary judgment filed by Plaintiff, John R. Ketchum (#29) and Defendant, Saint-Gobain Corp. Each party maintains that because there is no genuine issue of material fact, they are entitled to judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the motion filed by Plaintiff will be granted, and the motion filed by Defendant will be denied. Because the motions encompass the same issues, they will be addressed concomitantly.

## FACTUAL STATEMENT

Ketchum began working for what would become Saint-Gobain Corporation on January 13, 1975.[1] Ketchum participated in the Saint-Gobain Retirement Income Plan, CertainTeed Corporation Hourly-Rated Employees' Pension Plan (the "Plan").[2] The parties agree that the Plan is governed by the Employee Retirement Income Security Act ("ERISA").[3]

---

[1] Rec. # 1-1, ¶ 2, Suit on ERISA Pension Plan.
[2] Rec. # 30, ¶ 2, Revised Joint Stipulations Regarding ERISA-Governed Benefit Plan.
[3] *Id.* ¶ 1.

1

On March 1, 2011, Ketchum was injured on the job and received workers' compensation from March 2, 2011, through June 21, 2016.[4] From September 1, 2011, through March 1, 2014, Ketchum received company long-term disability benefits; these benefits were terminated when Ketchum opted to receive a settlement in lieu of monthly payments.[5] Ketchum received an award letter from the Social Security Administration ("SSA") on April 22, 2012, indicating that his disability was retroactive to March 1, 2011.

Ketchum received a letter from the Benefits Committee (hereinafter referred to as the "Committee") dated November 21, 2011, which provided estimated benefit calculations for Early Retirement and Disability Retirement,[6] as well as the requirements to be eligible for Disability Retirement. The letter does not state that a written application is required for eligibility.[7]

On June 7, 2016, Ketchum notified the Committee that he wished to apply for retroactive retirement disability benefits as of January 1, 2012.[8] On August 4, 2016, the Committee granted Ketchum's request for retirement disability benefits commencing July 1, 2016, but denied his request for the additional retroactive payments.[9] On August 24, 2016, Ketchum's counsel asked the Committee to pay disability benefits retroactive to April 1, 2011, citing the Plan's 2004 Summary Plan Description ("SPD") for the proposition that "disability requirement benefit[s] will begin on the first day of the month following the date you are last credited with an Hour of Service."[10]

---

[4] Rec. #26-1, p. 16, Administrative Record.
[5] *Id.* at p.24.
[6] The estimated benefit calculations for Early Retirement is $1,197.36 per month for life, and Disability Retirement monthly benefits would be $1,850.00 until Ketchum reached age 65 after which he would elect another form of payment. *Id.* at p. 2.
[7] *Id.* at p. 2.
[8] *Id.* at p. 9.
[9] *Id.*
[10] *Id.* at p. 13.

On November 21, 2016, the Committee denied Ketchum's request for retroactive application of disability benefits to April 1, 2011.[11] The denial letter advised Ketchum that although the 2004 SPD provided that disability benefits would begin the first day of the month following the last credited Hour of Service, the SPD also provided that a participant "need[s] to apply for [his] benefits no more than 90 days before [he] want[s] payments to begin."[12] The letter further noted that the "Situations that Could Affect Your Benefits" section provides that a "participant's benefits may be lost, reduced, or suspended if the participant 'fail[s] to make proper application for benefits. . . .'"[13] Relying on these two provisions, the letter informed Ketchum that to "receive disability benefits commencing April 1, 2011, Mr. Ketchum should have applied for benefits during the 90-day period ending on April 1, 2011."[14]

The letter also referred Ketchum to the Plan itself, noting that:

> The last sentence of Section 4.3(a) of the Plan permits disability benefits to begin on the first day of the following month following the date the participant was last credited with an hour of service, but only if the participant 'meets all of the above requirements,' including the requirement in the first sentence of this section that the participant complete an application for benefits.[15]

The letter noted that under Section 8.12(a)-(b), the Plan also provides that "'benefits shall not commence until proper written application for same is received by the Benefits Committee'" and that "'no payments shall be made for the period in which benefits would have been payable pursuant to Section[]...4.3. [disability benefits], if the

---

[11] *Id.* at pp. 16-18, Letter from Saint-Gobain Corporation Pension Administration Team.
[12] *Id.* at p. 16.
[13] *Id.*
[14] *Id.*
[15] *Id.* at p. 17.

3

Participant or Spouse had made timely application....'"[16] In other words, this provision prohibits retroactive disability benefits.

Under Section 4.3(a) of the Plan, Ketchum's "disability benefits will continue until he reaches his normal retirement date (i.e. the first day of the month following his 65th birthday or August 1, 2017)...."[17] The letter further advised that "following the cessation of disability benefits, Mr. Ketchum may elect a retirement benefit from the Plan."[18] On March 31, 2017, the Committee denied Ketchum's final appeal under Sections 4.3 and 8.12 of the Plan, which the Committee interpreted to prohibit retroactive disability benefits.[19]

Ketchum maintains that the Committee wrongfully denied his claim for retroactive disability benefits.[20] First, Ketchum argues that there are ambiguities throughout the Summary Plan Description ("SPD") and the Plan as well as conflicts between the two. Next, Ketchum argues that the Committee's reading of the Plan leads to an unexpected and unreasonable outcome which does not achieve the goals of ERISA, and finally, the Committee's interpretation of the Plan is unfair.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[16] *Id.* at p. 16. In 2006, the Plan was amended to require participants to apply in writing to receive retirement benefits (hereinafter referred to as the "2006 Amendments").
[17] *Id.*
[18] *Id.*
[19] *Id.* at p. 22.
[20] Rec. #1-1, Suit on ERISA Pension Plan.

4

of law.[21] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[22] A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[23] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[24] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[25] The burden requires more than mere allegations or denials of the adverse party's pleadings. The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[26] There is no genuine issue of material fact if, viewing the evidence in the light more favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[27] If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.[28] The court will construe all evidence in the light most favorable to the nonmoving party, but will not infer the existence of evidence not presented.[29]

Ketchum has the burden of proof at trial, thus he bears the burden of producing evidence to support the essential elements of his claim.[30]

## LAW AND ANALYSIS

---

[21] Fed. R. Civ. P. 56(c).
[22] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[23] *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999).
[24] *Vera v. Tue*, 73 F.3d 604, 607 (5th Cir. 1996).
[25] *Anderson*, 477 U.S. at 249.
[26] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).
[27] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[28] *Anderson*, 477 U.S. at 249-50.
[29] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).
[30] *Celotex*, 477 U.S. at 324.

In the ERISA context, courts review an administrator's denial of benefits *de novo* unless the plan grants the administrator discretion to determine a claimant's eligibility of benefits, in which case the administrator's decision is reviewed for an abuse of discretion.[31] The parties have stipulated that the Plan grants the administrator discretion to determine a claimant's eligibility for benefits.[32]

With respect to reviewing an administrator's discretionary interpretation of its own ERISA plan, the Fifth Circuit applies a two-step analysis. First, a court must determine the legally correct interpretation of the plan and whether the administrator gave the plan a legally correct reading.[33] The interpretation of the plan involves balancing several factors: (1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan.[34]

When interpreting an ERISA plan, the Court must "give its language the ordinary and generally accepted meaning."[35] If the administrator's interpretation was legally incorrect, the court must ask whether the administrator's decision constituted an abuse of discretion. This latter determination turns generally on the balance of three factors: "(1) the internal consistency of the plan under the administrator's interpretation; (2) any relevant regulations formulated by the appropriate administrative agencies; and (3) the factual background of the determination and any inferences of lack of good faith."[36]

---

[31] *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989).
[32] *See* Rec. #18, Joint Stipulation.
[33] *Surratt v. Unum Life Ins. Co. of America*, 2013 WL 4648460 (E.D. La. 2013); *Gosselink v. Am.Tel. & Tel., Inc.*, 272 F.3d 722, 726 (5th Cir. 2001).
[34] *Id.*
[35] *Id. Koehler v. Aetna Health Inc.*, 683 F.3d 182 (5th Cir. 2012).
[36] *Gosselink*, 272 F.3d at 726.

An abuse of discretion occurs only when "the plan administrator acted arbitrarily and capriciously."[37] A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for denial.[38]

*Did the Defendant abuse its discretion by treating similarly situated Plan participants differently?*

Ketchum argues that Defendant abused its discretion because of its inconsistent treatment of similar Plan participants. Ketchum relies on the Committee's denial letter which acknowledged that it had made retroactive disability benefits to another Plan participant.[39] That letter acknowledged that the "Plan has not fully implemented the 2006 elimination of retroactive disability benefits. The extent to which retroactive disability payments were mistakenly paid is not fully known and the Plan may need to look at its options for recovering any such overpayments depending on the outcome of this claim."[40]

Ketchum relies on the Committee's admission that it had "mistakenly" paid retroactive benefits to at least one other worker (a "Plan participant") that was similarly situated as Ketchum. Thus, Ketchum accuses the Committee of disparate treatment and bad faith. Ketchum cites *Encompass Office Solutions, Inc. v. Louisiana Health Service & Indemnity Co.*,[41] wherein the Fifth Circuit found that defendant had abused its discretion by denying plaintiff's claims for covered services, as shown by its *inconsistent treatment of similar providers*. The Court finds that the *Encompass* case is not applicable here.

---

[37] *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009).
[38] *Id.* (internal quotation marks and citations omitted).
[39] Rec. # 27-3, p. 27.
[40] *Id.*
[41] 919 F.3d 266 (5th Cir. 2019).

7

That case involved the intentional decision to deny coverage for services even though the insurer could cite no plan language that authorized it to limit payment based on who provided the services, nor was there any written internal policy that would explain why it treated similar providers inconsistently.

Defendant remarks that Ketchum has failed to provide evidentiary support, and/or the Administrative Record is devoid of any evidence that the Plan participant that mistakenly received retroactive benefits, requested those benefits under identical circumstances. In other words, there is no evidence in the record that the Plan participant was injured on the same date, under the same plan version, and applied for benefits on the same time-line as Ketchum. Defendant asserts that there is no evidence to suggest that this individual picked the same path as Ketchum in attempting to circumvent Plan rules to obtain additional benefits.

Defendant argues that even if retroactive benefits were mistakenly paid, the Committee acknowledged its mistake and made clear it was analyzing its options for recovering mistakenly paid benefits. Defendant asserts that Ketchum's request would in effect cause the Plan to pay out retroactive benefits it has expressly prohibited under the 2006 Amendments, *ad infinitum*. Moreover, because the Plan Administrator has a fiduciary obligation to pay Plan benefits in accordance with its terms, it must take steps to address any incorrect benefit payments.

The Court agrees with Defendant that there are not sufficient facts regarding Ketchum's co-worker to make a comparative analysis, and even if the circumstances were exactly the same, the Court finds that an alleged mistaken payment of benefits should not be deemed a gateway to retroactive disability benefits for all future participants.

*Was the Committee's decision to deny Plaintiff retroactive disability benefits legally correct?*

This step of the analysis requires the Court to determine if the interpretation is consistent with a fair reading of the Plan. Basic contract interpretation principles can be utilized to determine the meaning of a plan and "ambiguities in insurance policies are construed against the insurer."[42]

Ketchum maintains that that the Plan is not fair because there are ambiguities and inconsistencies between the Summary Plan Description ("SPD") and the Plan. Ketchum argues that the SPD does not require a written application for the worker to qualify for benefits noting that the "eligibility section/idea is completely separate from the application section/idea."[43] Ketchum acknowledges that the SPD states that "[y]our benefits *may* be lost, reduced or suspended in the following circumstances: . . . You fail to make proper application for benefits or fail to provide the necessary information." Thus, Ketchum argues that the SPD does not require a written application to qualify for benefits because the language is permissive and not mandatory.

Next, Ketchum points to the Plan language and maintains that the only requirement for eligibility for disability benefits is that the Participant be credited with at last 15 years of Service, be declared disabled by the Social Security Administration and a qualified physician appointed by the Benefits Committee. Ketchum acknowledges the first sentence of § 4.3 (a) which states that "[e]xcept as otherwise provided in an applicable Appendix, by written application delivered to the Benefits Committee as

---

[42] See *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 345 (5th Cir. 2002).
[43] Rec. #29-4, p. 11 of Memorandum in Support of Motion for Summary Judgment.

described in Section 8.12, a Participant who satisfies the following requirements may elect to receive the Disability benefit described in this Section. . ."[44]

Ketchum relies heavily on § 4.3 (b) which provides in pertinent part that "[e]ffective January 1, 1990, Disability benefits shall commence on the first day of the month next following the date he was last credited with an Hour of Service . . . ." Ketchum then argues that if a written application is indeed a requirement for eligibility, the last quoted language of the Plan would indeed be meaningless surplusage. Thus, Ketchum argues that the two provisions in § 4.3 ((a) and (b)) conflict with each other and are not consistent with the SPD. Ketchum suggests that the only logical interpretation of the Plan is that "once a Participant has qualified for Disability Benefits, and decides he wishes to receive those benefits, he must submit a written application to start the ball rolling, following which the Benefits Committee should pay retroactive benefits."[45]

Defendant argues that Ketchum conveniently leaves out a portion of § 4.3(b) as well as the cross-reference to § 8.12. Section 4.3(b) includes "provided he meets all of the above requirements." Defendant argues that there is an additional requirement to be eligible for disability benefits expressed in § 4.3(a), which states "by written application delivered to the Benefits Committee as described in Section 8.12." Section 8.12 provides as follows:

Application and Forms for Benefits.

    (a)    Application Required. The Benefits Committee shall require a Participant, or a Spouse entitled to a survivor benefit under Section 4.4(a), to file with it an application for a benefit, and to furnish all pertinent information

---

[44] Rec. #26, p. 18 Administrative Record.
[45] *Id.* p. 12.

requested by it... Except as provided in paragraph (b), benefits shall not commence until proper written application for same is received by the Benefits Committee.

Section 8.12 (b) provides, in pertinent part, that "[n]o payments shall be made for the period in which benefits would have been payable pursuant to Sections 4.1, 4.2 4.3 or 4.4(a) if the Participant or Spouse had made timely application..."

Ketchum argues that § 8.6(a) the Plan is ambiguous and contradicting which must be resolved in his favor. That provision (Claims Procedure and Filing of a Claim) states that any Participant or Spouse *"may"* file a written claim. In other words, this language is discretionary as opposed to mandatory.

Ketchum also argues that § 11.5 of the Plan is ambiguous. That provision states that:

> <u>Inability to Locate Payee</u>. Each person entitled to receive benefits under the Plan shall be responsible for informing the Benefits Committee of his mailing address for purposes of receiving such benefits. If the Benefits Committee is unable to locate any person entitled to receive benefits under this Plan, *such benefits shall not be forfeited but shall be carried as a contingent liability of the Plan and shall be payable when a proven and legitimate claim therefor has been submitted to the Benefits Committee.* (Emphasis added)

Ketchum argues that the language emphasized hereinabove creates an ambiguity and interprets the provision to mean that the Committee intended that all retirement benefits be non-forfeitable. The Court disagrees. The title of the provision indicates that § 11.5 applies when there is a Plan participant entitled to payment who cannot be located.

Defendant argues that the Plan document, not the SPD, governs a wrongful denial of benefits claims under § 502(a)(1)(B) of ERISA citing *Koehler v. Aetna Health Inc.*[46] In *Kohler*, the Fifth Circuit noted that the Supreme Court holds that § 502(a)(1)(B) of ERISA "does not authorize courts to enforce the terms of a plan summary, because the provision only authorizes enforcement 'of the terms of the plan.'"[47] Thus, the Plan text ultimately controls the administrator's obligations in § 502(a)(1)(B) claims. A plaintiff can only "hold the administrator to conflicting terms in the plan summary through a breach-of-fiduciary-duty claim under § 1132(a)(3).[48] As noted by Defendant, Ketchum makes his claim under § 502(a)(1)(B) of ERISA,[49] therefore, this Court's abuse of discretion review must be based on the Committee's interpretation of the Plan, not the SPD. However, inconsistencies and/or ambiguities within the Plan will be addressed below.

*Is there an ambiguity in the Plan, and if so, did the Committee abuse its discretion in denying Ketchum retroactive disability benefits?*

Ketchum argues that the provisions of the Plan that sets the time-line for paying disability benefits as interpreted by the Committee leads to absurd consequences. In addition, Ketchum argues that the Plan's interpretation would cause him to lose vested benefits in violation of the Anti-Cut Back Rules[50] and the Plan's terms.[51] Ketchum concedes that courts have held that "any plan remotely connected with disability is a welfare benefit plan, and therefore not covered by the Anti-Cut Back Rules.[52] Thus, we

---

[46] 683 F.3d 182, 189 (5th Cir. 2012), citing *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011).
[47] *Koehler*, 683 F.3d at 189, citing *Amara*, 563 U.S. at 436.
[48] Section 502(a)(3) of ERISA. *Koehler*, 683 F.3d at 190.
[49] 29 U.S.C. 1132(a)(1)(B).
[50] 29 U.S. C. 1054(g).
[51] Section 7.1 of the Plan, Rec. #26, p. 93 of the Administrative Record.
[52] Rec. #29-4, pp. 15-16.

will only address Ketchum's argument that the Committee's interpretation causes him to lose vested benefits in violation of the Plan's terms.

Ketchum argues that the 2006 Amendments to the Plan which prohibits payment of benefits retroactively, decreases a participant's accrued benefits. Thus, Ketchum maintains that the 2006 Amendments are therefore invalid and unenforceable.

Section 7.1 of the Plan states that "[e]xcept as permitted by ERISA or the Code, no amendment of the Plan shall decrease a Participant's accrued benefits or eliminate an optional form of distribution."[53] Ketchum further relies on § 7.4 which states that "[i]n the event that the Plan is completely or partially terminated, the rights of all affected Participants to Accrued Annual Pensions to the date of such termination shall become fully vested and nonforfeitable only to the extent funded.[54]

Ketchum explains that a Plan Participant qualifies for Disability Benefits once he is found to be disabled by the SSA. However, Social Security rules state that a worker must be disabled five (5) months before he/she can receive benefits. As to Ketchum, he was found to be disabled as of March 1, 2011, but could not become entitled to benefits until August 2011. Thus, Ketchum asserts that even if he had immediately applied for disability benefits under the Plan after receiving the SSA letter, he would not have been paid retroactively to the SSA's determined date of disability. Ketchum opines that in order for him to receive benefits "on the first day of the month following the date he was last credited with an Hour of Service," he would have had to apply for benefits in March

---

[53] *Id.*
[54] Section 7.4 of the Plan, Rec. #26, p. 94 of the Administrative Record.

2011 (prior to receiving the disability letter from the SSA and notably, prior to him being injured at work).

Ketchum further argues that he would have lost vested benefits had he applied for Disability Benefits the very day he received the SSA award letter (April 22, 2012). Ketchum calculates that he would have been deprived of $22,442.58 under the Committee's interpretation of the Plan language if he had applied in writing on the first possible day.

Ketchum explains that the Plan adjusts a Plan Participant's Hours of Service but caps the hours at 1140.[55] Ketchum maintains that 1140 hours is 47.5 days which he rounds up to 48 days. If one counts 48 days from the disability date of March 2, 2011, Ketchum asserts that the date his benefits should have commenced would be April 19, 2011. Thus, if he would have applied for disability benefits on the day he received the SSA award letter (the triggering event for disability), and using the April 19, 2011 date as his last credited date with an Hour of Service, Ketchum remarks that the difference between April 19, 2011 (last day of Hours of Service with credits applied) and April 22, 2012 (SSA award letter date), would be 369 days. Ketchum calculated his daily benefits to be $60.82.[56] Thus, he argues that he was deprived of $22,442.58 in benefits under the Committee's interpretation of the plan, even if he would have applied for benefits on the date he received the SSA award letter.[57]

---

[55] For any single continuous period during which the participant performs no duties.
[56] Ketchum was paid $1,850 per month or $22,200 per year. $22,200 ÷ 365 = $60.82.
[57] $60.82 X 369 = $22,442.58.

14

Defendant responds that Plaintiff's logic is fundamentally flawed when considering how the Plan credits Hours of Service. Defendant states that the Plan credits a worker receiving workers compensation and accident plan benefits (referred to as "Nonworking Paid Time) up to a year.[58] The Plan provides, in pertinent part, as follows:

Hours of Service means:

> (a) <u>Performance of Duties</u>. The actual hours for which an Employee is paid or entitled to be paid for the performance of duties by the Company;
>
> (b) <u>Nonworking Paid Time</u>. Each hour for which an Employee is paid or entitled to be paid by the Company directly or indirectly (such as payments made under worker's compensation or accident and sickness plans) on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to a vacation, holiday, illness, incapacity, *disability*, layoff, jury duty, military duty or leave of absence or a period of time commencing prior to September 1, 1998 during which an individual received severance payments from the Company; provided, however, that no more than 1,140 Hours of Service shall be credited to an Employee on account of any single continuous period (other than a period commencing prior to September 1, 1998 for which severance payments are made. . . .)[59]

The Hours of Service for Nonworking Paid Time is capped at 1,140 hours or 142 days[60] (7.1 months)[61] for any single continuous period during which the worker performs no duties. Ketchum calculates the 1,140 as 47.5 days.[62] The Court's calculation is made based on an 8-hour work day and a 5-day work week. Thus, Ketchum's last credited hour of service was January 1, 2012 which is his undisputed termination date. In his reply,

---

[58] "...a Participant or an Employee shall be credited with one Year of Service for each Plan year in which he was credited with at least six months of service." Rec. #26, Section 3.3 (a), p. 75 Administrative Record.
[59] Rec. #26-1 p. 70, Administrative Record.
[60] 1,140÷8 hours per day = 142.5 days.
[61] 142÷5=28.4; 28.4÷4=7.1.
[62] Ketchum calculates the 1,140 hours as 47.5 days (1140÷24=47.5).

15

Ketchum concedes that his calculations are incorrect and the last credited Hour of Service is January 1, 2012.[63] However, he argues that his computations illustrate that a Participant cannot be paid as of his last credited Hour of Service without that payment being retroactive, which is contrary to the Plan's prohibition against retroactive payments. Hence, Ketchum maintains that the Plan terms contradict themselves.

The Plan expressly states that disability retirement benefits commence the first day of the month following the date a Participant was last credited with an Hour of Service (both parties now agree that January 1, 2012 is Ketchum's last day of service) which includes hours of work plus Nonworking Paid Time, capped at 1,140 hours. As noted above, the Plan expressly prohibits retroactive payments (§ 8.12(b)) and yet also expressly prohibits a deprivation of accrued benefits (§ § 7.1 and 7.4). In other words, the Plan states that it will not make payments for the period in which benefits would have been made if the Participant had timely made an application, but disability benefits will commence on the first day of the month following the date the Plan participant was last credited with an Hour of Service...." In addition, the Plan expressly states that no "amendments to the Plan shall decrease a Participant's accrued benefits."[64]

Ketchum opines that there do not appear to be any unanticipated costs resulting from his interpretation of the Plan—that he is entitled to retroactive disability benefits. Defendant argues that this is incorrect because Ketchum's interpretation would obligate the Plan to pay prohibited retroactive payments to other participants who are seeking retroactive disability benefits.

---

[63] Rec. #40, p. 2, Plaintiff's Opposition to Defendant's Motion for Leave to File Sur-Reply.
[64] Rec. #26-1, p. 94, § 7.1.

The Court disagrees. Ketchum was a vested Plan participant who was entitled to disability benefits when he was determined disabled by the SSA. Thus, we find that there are no unanticipated costs resulting from Ketchum's interpretation of the Plan.

Ketchum also argues that there are inconsistencies within the Plan between §§ 8.6 entitled <u>Claims Procedure</u> and § 8.12 entitled <u>Application and Forms for Benefits</u>. § 8.6 states that "[a]ny Participant or beneficiary under the Plan ("Claimant"), *may* file a written claim for a Plan benefit with the Benefits Committee . . .", whereas § 8.12 states that "[t]he Benefits Committee *shall* require a Participant, . . . to file with it an application for a benefit..." The Court agrees that the permissive and mandatory language with regards to filing a claim for benefits is inconsistent and has the potential to confuse a Plan participant.

The 2006 Amendment which prohibits retroactive payments effectively decreases a Participant's accrued benefits—the benefits from the the date the participant actually qualified for benefits (January 1, 2012) to the date of the written application (July 1, 2016). Furthermore, the Court notes that the provision which prohibits retroactive disability benefits is located in the procedural section of the Plan entitled <u>Application and Forms for Benefits</u>,[65] not in the section which expressly sets forth the requirements for a Participant to be eligible for disability benefits.[66]

The plain language of § 4.3 of the Plan governing eligibility benefits provides that a Participant must satisfy the following requirements: (1) be credited with at least 15 Years of Service, and become disabled while an employee, and (2) be awarded disability

---

[65] § 8.12, <u>Application and Forms for Benefits</u>, Rec. #26-1, p. 99.
[66] § 4.3 <u>Disability Benefits</u>, Rec. #26-1, p.81.

benefits under the Federal Social Security Act by the SSA, and (3) the Participant's disability must be confirmed by a qualified physician appointed by the Benefits Committee.[67] This section further provides that "Disability benefits shall commence on the first day of the month next following the date he was last credited within an Hour of Service, provided he meets all of the *above* requirement, . . ."[68] This section of the Plan does not require that a Participant file an application to be eligible, but does require that a written application be filed to commence payment of the benefits.

Defendant relies on § 8.12(a) (Application and Forms for Benefits) titled "ADMINISTRATION" to impose an additional eligibility requirement, to wit, that the Participant file an application to be eligible for disability benefits. Defendant further relies on § 8.12(b) (Late Application For or Failure to Apply For Benefits) which is as follows:

> In the event a Participant, or a Participant's Spouse entitled to a survivor benefit under Section 4.4(a), fails to apply to the Benefits Committee for benefits by the later of (a) the Participant's Normal Retirement Date or (b) the date the Participant terminates employment with the Company and its Affiliates, the Benefits Committee shall make diligent efforts to locate the Participant or Spouse and shall either obtain an application, or commence distribution without an application. In the event the Participant fails to complete an application, distribution shall be made in the form described in Section 4.4(b), assuming the Participant's Spouse is 3 years younger than the Participant. *No payments shall be made for the period in which benefits would have been payable pursuant to Sections 4.1, 4.2, 4.3 or 4.4(a) if the Participant or Spouse had made timely application;* . . .

---

[67] Rec. #26-1, p. 81, § 4.3.
[68] *Id.* (emphasis added).

Defendant argues that the above emphasized language expressly prohibits Ketchum's request for retroactive disability benefits. Ketchum argues that this language is ambiguous and/or conflicts with the stated eligibility requirements in § 4.3.

This language in § 8.12 is contrary, or actually an additional requirement to § 4.3. The Court finds that the Committee has not given a fair reading of the Plan. Had the author of the Plan intended to make "filing a written application" an eligibility requirement for disability benefits, it could have done so by adding that requirement in § 4.3, in the proper place. No doubt, Defendant relies on the language of § 4.3 – "by written application delivered to the Benefits' Committee as described in Section 8.12." However, as noted above, § 8.12 is a procedural provision. In other words, here is how you proceed to be paid benefits after you have qualified based on the requirements provided in § 4.3. Section 4.3 expressly mandates three requirements: (1) a Participant who is credited with at least 15 Years of Service and becomes Disabled while an Employee, (2) the Participant has been awarded disability benefits under the Federal Social Security Act as declared by the SSA, and (3) the Participant's Disability must be confirmed by a qualified physician.

The Court notes that structurally, the language Defendant relies on in § 4.3 is situated prior to the express language that addresses the eligibility requirements. Thus, the Court finds that this provision is ambiguous at best, and it was an abuse of discretion for the Committee to interpret the Plan language to make filing a written application a requirement for eligibility. Furthermore, § 8.12(a) found in the procedural section of the Plan directly contradicts § 4.3(a) found in the disability benefits section of the Plan.

## CONCLUSION

## CONCLUSION

For the reasons stated hereinabove, the motion for summary judgment filed by Defendant, Saint-Gobain Corp. will be denied and the motion for summary judgment filed by Plaintiff, John R. Ketchum will be granted as the Court finds that the Committee's interpretation of the documents was not legally correct and an abuse of discretion. Accordingly, Plaintiff, John R. Ketchum is entitled to disability benefits retroactive to January 1, 2012 up until the commencement of normal retirement benefits, July 1, 2016.

Ketchum also seeks attorney's fees and interest. Under § 502(g) of ERISA,[69] a plan participant, beneficiary or fiduciary may be awarded attorney fees if he prevails in his suit under § 1132 to enforce his rights under his plan. Plaintiff has failed to support his prayer for attorney fees and interest. Thus, the Court will decline to entertain Ketchum's request at this time but will permit him to file a motion and memorandum in support setting forth his calculation of attorney fees, costs, and interest associated in bringing this action.

**THUS DONE AND SIGNED** in Lake Charles, Louisiana on this 22 day of July, 2019.

JAMES D. CAIN, JR.
UNITED STATES DISTRICT JUDGE

---

[69] 29 U.S.C. § 1132(g).